UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA

VERSUS

DEARIEUS DUHEART

CRIMINAL ACTION

NO. 11-67-BAJ-DLD

## RULING ON MOTION TO SUPPRESS

This matter is presently before the Court on a Motion to Suppress (doc. 18) filed by the defendant, Dearieus Duheart ("Defendant"). Defendant seeks to suppress all evidence seized and statements made in connection with an allegedly illegal stop of Defendant that occurred on April 30, 2011 (doc. 27). The Government opposed the motion (doc. 26). Defendant replied to the Government's opposition (doc. 27), and the Government supplemented the opposition (docs. 28 and 29). An evidentiary hearing was held on October 11, 2011 ("the hearing"), and the parties have filed post-hearing briefs (docs. 32 and 33).

## FACTS

At the hearing, the Court received testimony from Corporal Thomas Morse ("Cpl. Morse"), a K-9 division officer with the City of Baton Rouge; and Corporal Adam Lea ("Cpl. Lea"), a police officer with the City of Baton Rouge for the past

seven years.[1] Both officers were involved in the detention of Defendant. The Court also received testimony from Task Force Agent Kevin Heinz ("Agent Heinz")[2], assigned to the violent crime unit attached to the ATF task force with the Baton Rouge City Police department, and Special Agent Mike Desmond ("Agent Desmond")[3] of the ATF. Both agents transported Defendant from the East Baton Rouge Parish Prison to the Federal Courthouse.

Cpl. Morse, the officer who initiated the stop of Defendant, testified that he was doing a regular criminal patrol in his marked police unit in the early morning hours of April 30, 2011, when he observed a Ford Mustang make an "extremely wide" right turn from Choctaw Drive onto Plank Road. (Suppression Hr'g. Tr. 10:4-22 (Oct. 11, 2011)). Cpl. Morse testified that he was "directly behind the vehicle" when he observed the violation, ran the license plate on his computer, then "followed the vehicle down Plank Road just a little ways and then initiated [the] traffic stop in a safe area." (Hr'g Tr. 11:1; 15:2-4). The alleged traffic violation was not recorded by the video camera in the marked police unit.

As soon as he initiated the stop, Cpl. Morse asked Lakitra Bazile ("Bazile"), the driver of the Ford Mustang, to step out of the vehicle. Cpl. Morse testified

---

[1] Cpl. Lea testified that he's "either stopped [him]self or been a part of hundreds or thousands of traffic stops . . ." (Hr'g Tr. 104:17-23).

[2] Agent Heinz testified that he worked in uniform patrol for eight years, spent seven years in the narcotics division, and has been assigned to the ATF task force, violent crime unit for approximately a year and a half. (Hr'g Tr. 109:16-21).

[3] Agent Desmond testified that he has been a Special Agent since March of 2005. (Hr'g Tr. 120:22).

that while he was communicating with Bazile, Cpl. Lea arrived on the scene, and approached the driver's side of the Ford Mustang. (Hr'g Tr. 19:15-21). Cpl. Morse asserted that he had observed the front seat passenger, Defendant, "making very suspicious movements."[4] (Hr'g Tr. 19:15-21). Cpl. Lea testified that he approached the vehicle as a back-up officer to look for "other traffic violations . . . things that would be dangerous to us or other bystanders." (Hr'g Tr. 77:21-25; 22:1). Cpl. Morse contended that he observed Cpl. Lea approach the Ford Mustang, draw his weapon from the holster, and point it at the vehicle while giving orders to the passenger inside. (Hr'g Tr. 21:9-14). Cpl. Lea asserted that he "became in fear of my safety that he was going to draw some type of weapon and use it against me." (Hr'g Tr. 79:18-19). Cpl. Morse testified that Cpl. Lea then walked around to the passenger side of the vehicle, holstered his weapon, ordered the passenger (Defendant) out of the vehicle, conducted a pat down of Defendant, and subsequently found a weapon[5] that was concealed inside of Defendant's waistband. (Hr'g Tr. 21:14-18; 81:6-10).

Cpl. Morse took the weapon—a silver Ruger semi-automatic handgun—from Cpl. Lea and brought it to his police car to secure it. (Hr'g Tr. 21:21-22; 31:5-7). Cpl. Lea testified that he asked Defendant if he had ever been arrested,

---

[4] Cpt. Morse indicated that Defendant's "head was visible, then his head wasn't visible, then his head was visible, then it wasn't. He was moving around a lot." (Hr'g Tr. 21:6-8).

[5] The weapon had an obliterated serial number. (Hr'g Tr. 23:7; 35:12-14).

what he had been arrested for, and if he had ever been convicted of any crime. (Hr'g Tr. 99:9-11; 99:20). Defendant disclosed to Cpl. Lea that he had "been convicted of cocaine." (Hr'g Tr. 99:13-25).

While Cpl. Lea was taking Defendant "into custody,"[6] both officers began questioning Defendant (Hr'g Tr. 21:21; 22:7).[7] Cpl. Lea testified that he did not inform Defendant that he was under arrest. (Hr'g Tr. 84:18-19). Cpl. Morse testified that Cpl. Lea placed Defendant in the backseat of his police unit while Cpl. Morse tried to ascertain Defendant's criminal history, in addition to checking for the existence of a warrant for Defendant's arrest. (Hr'g Tr. 23:2-4; 34:2-4). Cpl. Morse indicated that Defendant admitted that he was a convicted felon. (Hr'g Tr. 66:6-7). Both officers asserted that when Cpl. Morse attempted to verify Defendant's criminal history on the computer in his police unit, the search revealed that Defendant had a criminal history; however, it did not show "any dispositions about convictions or felony convictions." (Hr'g Tr. 85: 16-24).

Cpl. Morse testified that when he asked both Cpl. Lea and Defendant if Defendant had been advised of his *Miranda* rights, both answered in the affirmative. (Hr'g Tr. 23:21-25; 38:1-2). In spite of what Cpl. Lea and Defendant represented to Cpl. Morse, Cpl. Lea admitted—at the hearing—that he had not

---

[6] The Court notes that although Cpl. Lea used the term "in custody," the Government asserts that the officers' detention of Defendant was "non custodial." See *infra* for a more detailed discussion of this issue.

[7] In his closing argument to the Court, Mr. Hipwell asserted—and the video recording reflects—that Defendant's shoes had been removed. (Hr'g Tr. 143:4-8).

advised Defendant of his *Miranda* rights until Defendant was sitting in the backseat of the police car, after he and Cpl. Morse had attempted to locate Defendant's criminal history on the computer in the police unit. (Hr'g Tr. 86:4-6). Cpl. Morse confirmed that an advisement of Defendant's *Miranda* rights was not given to Defendant for "a period of at least six or seven minutes," after "he was handcuffed, secured, and put in the rear of the police car." (Hr'g Tr. 65:20-21; 66:3-5). Cpl. Lea further confirmed that Defendant was not read his constitutional rights until approximately eight minutes after Defendant told Cpl. Lea that he had been "convicted of cocaine." (Hr'g Tr. 100:3-4; *see recording at* 3:06:30).

Cpl. Morse testified that, at the conclusion of the stop, Defendant was issued a misdemeanor summons for possession of a firearm with an obliterated serial number, and was then released. (Hr'g Tr. 41:5-7). Bazile was issued a citation for violating La. R.S. § 32:101(1). (Ex. "D-9"). Cpl. Morse further testified that he told Defendant:

> We both knew that he was a convicted felon, that he wasn't supposed to have the gun. He agreed. I told him that the computer system wasn't working, so I couldn't prove it that night and that a warrant would probably be issued for him in the future.

(Hr'g Tr. 41:10-14). On a later date, Defendant was taken into custody of the State of Louisiana, and confined to the East Baton Rouge Parish Prison on an unrelated charge.

On June 29, 2011, between 8:00 a.m. and 9:00 a.m., Agent Heinz and Agent Desmond transported Defendant from the East Baton Rouge Parish Prison to the Federal Courthouse (Hr'g Tr. 109-10; 121; 131:20-21). Both agents testified that Agent Desmond "immediately" advised[8] Defendant of his *Miranda* rights. Defendant was seated in the backseat of Agent Desmond's vehicle, which was parked outside of the prison; and Agent Heinz was seated in the passenger seat (Hr'g Tr. 118:13; 110:20-25; 122:9-13). Both Agents testified that Defendant "responded affirmatively that he did understand his rights." (Hr'g Tr. 111:23-24). Agent Heinz asserted that he heard Agent Desmond ask Defendant "about the weapon that night, where he got it from, asked him questions regarding the obliterated serial number, if he had scratched them [sic] off or if it had been scratched off prior to him getting the gun." (Hr'g Tr. 112:13-17). Both Agents testified that that Defendant told them that "just prior to being stopped that he had gotten into an altercation at a waffle house with a subject, that he had gone and borrowed this weapon from an individual at the time. . . . that he had not scratched the serial number off, that it had to be done [sic] prior to him getting the weapon." (Hr'g Tr. 112:21-25; 113:1-9; 123:14-24).

## DISCUSSION

The issues before the Court are: 1) whether the stop of Defendant was supported by reasonable suspicion; 2) whether the frisk of Defendant was

---

[8] Agent Heinz asserted that he saw and heard Agent Desmond read the *Miranda* rights off of a card that Agent Desmond carries in his vehicle (Hr'g Tr. 111:8-21).

6

proper; 3) whether Defendant's statements made in connection with the stop should be suppressed; and 4) whether Defendant's confession in connection with his transport from Parish Prison to the Federal Courthouse should be suppressed.

**The Traffic Stop**

The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. Traffic stops are deemed seizures for the purposes of the Fourth Amendment. *U.S. v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005). The legality of a traffic stop is analyzed under the framework articulated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under the two-part *Terry* reasonable suspicion inquiry, the Court must determine whether the officer's action was: (1) "justified at its inception"; and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 19–20.

The Court will first consider the first prong of the *Terry* analysis. The Fifth Circuit had held that "for a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *U.S. v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005). The Supreme Court has stated that in making a reasonable suspicion inquiry, a court "must look at the totality of the circumstances of each case to see whether the

detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). The Fifth Circuit has held that "reasonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." *Lopez-Moreno,* at 430. In evaluating the totality of the circumstances, a court may not consider the relevant factors in isolation from each other. *Arvizu,* 534 U.S. at 274. In scrutinizing the officer's basis for suspecting wrongdoing, it is clear that the officer's mere hunch will not suffice. *Terry,* 392 U.S. at 27. It is also clear, however, that reasonable suspicion need not rise to the level of probable cause. *Arvizu,* 534 U.S. at 274.

In a recent opinion, the Fifth Circuit discussed the issue of whether a traffic stop is justified at its inception. *U.S. v. Raney,* 633 F.3d 385 (5th Cir. Feb. 10, 2011). The Fifth Circuit noted that "if the alleged traffic violation forming the basis of the stop was not a violation of state law, there is no objective basis for justifying the stop." *Id.,* at 340. The Fifth Circuit articulated that:

> The government bears the burden of proving that the stop was constitutional when, as here, the stop and search were conducted without a warrant. Thus, the suppression hearing provided the government the opportunity and obligation to present evidence establishing the validity of the traffic stop.

*Raney,* 633 F.3d at 392.

In the case at hand, the police report indicates that the Ford Mustang, driving east in the right lane of Choctaw Drive, made an illegal right turn—"somewhat greater than 90 degrees"—onto Plank Road (doc. 18-1, p. 1; doc. 27, p. 1). The officers informed Bazile that her turn violated the city ordinance that states "both the approach for a right turn and a right-hand turn shall be made as close as practicable to the right-hand curb or edge of the roadway" (*Id*). The Government argues that the issue in this case is whether Cpl. Morse saw something that "gave him probable cause to conclude that there was a traffic violation that indeed had occurred." (Hr'g Tr. 144:21-22). The Government further asserts that Cpl. Morse "was reasonable in believing that the driver of the Ford had committed a traffic violation when he observed this vehicle make a right turn from the outside lane of South Choctaw Drive onto the inside law of Plank Rd. headed southbound." (Doc. 33, p. 3). Defendant avers that the officer did not have probable cause nor reasonable suspicion to stop Bazile's vehicle (doc. 18, ¶2); (doc. 18-1, p. 1).

Since the stop at issue was conducted without a warrant, the Government bears the burden in this case of proving the stop of the Ford Mustang was constitutional. *See Raney*, 633 F.3d at 392. The Government's witness, Cpl. Morse, who initiated the stop, provided credible testimony that Bazile made a right-hand turn from the inside lane of Choctaw Drive onto the outside lane of Plank Road in violation of Section 11:100 of the Baton Rouge Code of

Ordinances. *See supra.* Pursuant to the relevant subpart of the Louisiana Highway Regulatory Act to "right turns," La. R.S. § 32:101(1)[9] "Required position and method of turning at intersections":

> (1) **Right Turns.** Both the approach for a right turn and a right turn shall be made as close as practicable to the right-hand curb or edge of the roadway.

At the hearing, Cpl. Morse testified that he was "directly behind" the Ford Mustang when he observed a traffic violation (Hr'g Tr. 11:1):

> I saw a Ford Mustang make a right turn from Choctaw onto Plank that would be going south onto Plank Road. When the vehicle made that turn, they were in the right lane of Choctaw; and when they made the turn, they made it extremely wide, going all the way into the lane of Plank Road. So it was an extremely wide turn that they made.

(Hr'g Tr. 10:18-23). Cpl. Morse further testified that:

> It's just that when they make the right turn, you are supposed to stay as close as practicable to the curb when making that right turn. So, basically, stay in the right lane and go into the right lane. Basically, stay in your own lane when you make that turn.

(Hr'g Tr. 15:21-25). Defendant neither set forth evidence to controvert Cpl. Morse's testimony, nor produced a witness who could testify to the contrary. Therefore, the Court finds that La. R.S. § 32:101(1) serves as an objectively reasonable justification for initiating the stop, and that Cpl. Morse was objectively

---

[9] The text of this provision is identical to section 11:100.

reasonable in suspecting that Bazile violated La. R.S. § 32:101(1).[10] As such, the Court concludes that the initial stop of the Ford Mustang was supported by reasonable suspicion, and, therefore, passes constitutional muster.

As the Court will address the issue of detention in the discussion and analysis of Defendant's first confession, the Court will not delve into a lengthy analysis of the second prong of *Terry*.

**The Frisk**

The Fifth Circuit has held that during a detention, a frisk or pat-down for weapons is warranted if an officer can articulate specific facts and reasonable inferences that "he is dealing with an armed and dangerous individual." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 209 (5th Cir. 2009). The search is "a limited protective search for concealed weapons, and not a search to discover evidence of a crime." *Id.* The manner in which the seizure and search were conducted is, "of course, as vital a part of the inquiry as whether they were warranted at all." *Id.* The Court must balance the suspect's liberty interest and the public safety interest by "countenancing a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he

---

[10] The Court notes that the Fifth Circuit has made clear that "an officer's subjective motivations are irrelevant in determining whether his or her conduct violated the Fourth Amendment." *U.S. v. Lopez-Moreno*, 420 F.3d at 432 (5th Cir. 2005). The Fifth Circuit in *Lopez-Moreno* also noted that: "[s]o long as a traffic law infraction that would have objectively justified the stop had taken place, the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic infraction is irrelevant for purposes of the Fourth Amendment ...." *quoting Goodwin v. Johnson*, 132 F.3d 162, 173 (5th Cir. 1997).

has reason to believe that he is dealing with an armed and dangerous individual . . ." *U.S. v. Michelletti*, 13 F.3d 838, 840–841 (5th Cir. 1994). An officer need not be certain that an individual is armed, however; the Court must determine whether "a reasonably prudent man could believe, based on specific and articulable facts, that his safety or that of others is in danger." *Michelletti*, at 840-41. In assessing reasonableness, "due weight" must be given to the facts and inferences viewed in light of the officer's experience. *Id.*

Defendant argues that the frisk was "an impermissible intrusion, not justified by a reasonable belief that Duheart posed a threat to the officers." (Doc. 32, p. 5). The Government contends that "there was a justification for the frisk, [and] that the officer had reason to believe that danger was posed to him by otherwise not frisking the defendant for firearms[,]"[11] and the Court agrees. As Cpl. Lea testified that: (1) he feared for his safety after seeing Defendant make several movements in the passenger seat of the vehicle; (2) the stop occurred in a high-crime area between 2:00 a.m. and 4:00 a.m.; and (3) Cpl. Lea had several years of experience as an officer who often initiated stops, the Court finds that Cpl. Lea had reasonable suspicion to frisk Defendant.[12]

---

[11] (Hr'g Tr. 6:21-23).
[12] When asked about his observation of Defendant making movements in the passenger seat, Cpl. Lea responded:
> At that point, I became in fear of my safety that he was going to draw some type of weapon and use it against me. I then pulled my service weapon out of the holster and got it in a position to where I could – to where I could use it quickly if I needed to.

(Hr'g Tr. 79:18-22).

Accordingly, both the stop of the Ford Mustang, and the frisk of Defendant were lawful; and, therefore, the firearm should not be suppressed.

**Defendant's Statements to Corporals Morse and Lea**

Pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), it is only in the context of a custodial interrogation that the *Miranda* protections are triggered. "The Government must administer *Miranda* warnings before custodial interrogations." *U.S. v. Chavira*, 614 F.3d 127, 132 (5th Cir. 2010). "Generally speaking, *Miranda* describes a custodial interrogation as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way." *Id.*, at 132-33 *citing Miranda*, 86 S.Ct. at 612. "The ultimate inquiry is whether there is a formal arrest or a restraint on freedom of movement of a degree associated with formal arrest." *Id.*, at 133.

Generally, statements obtained during a custodial interrogation without providing adequate warnings under *Miranda* are inadmissible. *Missouri v. Seibert*, 542 U.S. 600, 608 (2004). The Fifth Circuit has held that "a suspect is in custody for purposes of *Miranda* when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *U.S. v. Courtney*, 463 F.3d 333, 337 (5th Cir. 2006). But a defendant who voluntarily gives a statement to law enforcement in

a non-custodial situation need not be advised of his *Miranda* rights. *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

Defendant argues that both confessions he made in connection with his stop and detention should be suppressed, as his first confession was made before he was advised of his *Miranda* rights, and the second confession was given only a few minutes after he was advised of his rights (doc. 32, p. 4). The Government asserts that Defendant's seizure was non-custodial, and, therefore, Defendant's confession in response to the officers' questioning of Defendant prior to their advisement of his *Miranda* rights should not be suppressed. The Government further asserts that, as the questioning of Defendant was a non-custodial interrogation, the officers were not required to advise Defendant of his rights. (Doc. 33).

The Court first concludes that Defendant's detention was, indeed, custodial. Defendant was handcuffed, placed in the backseat of a patrol car, and had his shoes removed, and a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of a degree which the law associates with formal arrest. *See Courtney*, 463 F.3d at 337. As such, the officers were required to advise Defendant of his *Miranda* rights. Defendant began "confessing" a few minutes before 3:00 a.m., Defendant was not advised of his *Miranda* rights until approximately 3:06 a.m. (*See supra*, p. 4; doc. 32, p. 4). Defendant also confessed subsequent to the advisement of

his rights. As the Court finds that Defendant was in custody, his confession of being "convicted of cocaine" between 2:58:19 and 2:59:06, must be suppressed. (*See* Hr'g Tr. 99:1-19). Furthermore, pursuant to guidance provided by the Supreme Court in *Missouri v. Seibert*, 542 U.S. 600—where the Supreme Court held that *Miranda* warnings given mid-interrogation after the defendant gave an unwarned confession were ineffective, and thus a confession repeated after warnings were given was inadmissible at trial—the Court must also suppress any other confessions or statements Defendant made during his colloquy with officers Morse and Lea after he was advised of his rights.[13]

Accordingly, the Court concludes that all statements made by Defendant to the officers during the stop of the Ford Mustang should be suppressed.

**Defendant's Statements to Agents Heinz and Desmond**

As mentioned, *supra*, on June 29, 2011, nearly two months after Defendant was detained, Agent Desmond and Agent Heinz took Defendant into their custody to transport him to this Court. (*See* doc. 28, p. 2). Both agents testified that Agent Desmond immediately advised Defendant of his *Miranda* rights. After Agent Desmond advised Defendant of his *Miranda* rights, Defendant confessed that "just prior to being stopped that he had gotten into an altercation

---

[13] "In *Seibert*, the Supreme Court addressed the constitutionality of a police tactic called "question first," that calls for withholding *Miranda* warnings during an interrogation until the suspect gives a confession." *U.S. v. Courtney*, 463 F.3d at 338 *citing Seibert*, 542 U.S. at 504-06, 610-11. The *Seibert* court held that post-warning statements were inadmissible. *Id.* at 614-17.

at a waffle house with a subject, that he had gone and borrowed this weapon from an individual at the time. . . . that he had not scratched the serial number off, that it had to be done prior to him getting the weapon." (Hr'g Tr. 112:21-25; 113:1-9; 123:14-24). Based on testimony and evidence the Court received at the October 11, 2011 suppression hearing, the Court concludes that Defendant was properly advised of his *Miranda* rights by Agent Desmond, and any statements or confessions made to Agents Desmond and Heinz should not be suppressed.

The Court notes that the Government's position supports the Court's conclusion. The Government argues that: (1) a significantly long period of time passed from the original stop of Defendant to the second interview (sufficient attenuation between the conduct which arose on April 30, 2011, when the stop occurred, and June 29, 2011, when Agent Desmond interviewed Defendant and obtained a confession from him); (2) Agent Desmond, who conducted the interview with Defendant in June, was from a different and separate law enforcement agency than the officers who made the stop; and (3) it is undisputed that Defendant gave his statement after he was immediately advised of his *Miranda* rights. (Doc. 28, p. 4). The Government further relies on *Oregon v. Elstad*, 470 U.S. 298 (1985) to support its assertion that a subsequent administration of *Miranda* rights to a Defendant who has previously been given a voluntary but unwarned statement "should suffice to remove the conditions that

precluded the admission of the earlier statement" *Elstad*, at 314. With regard to a defendant's second statement or confession, the Supreme Court noted that:

> The finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements. The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative.

*Id.*, at 318. See also *U.S. v. Courtney*, 463 U.S. 333, 338 (5th Cir. 2006).

As such, the Court concludes that the confession Defendant made to Agents Desmond and Heinz on June 29, 2011, should not be suppressed.

## CONCLUSION

Accordingly, the Court concludes that: (1) the firearm recovered by officers Morse and Lea during a lawful stop will not be suppressed; (2) statements made by Defendant to officers Morse and Lea will be suppressed; and (3) statements made to Agents Desmond and Heinz on June 29, 2011, will not be suppressed.

For the foregoing reasons, the motion to suppress (doc. 18), filed by Defendant, is hereby **DENIED** in part, and **GRANTED** in part, for the reasons set forth in this ruling.

Baton Rouge, Louisiana, November 21, 2011.

_____
BRIAN A. JACKSON, CHIEF JUDGE
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA